KEVIN T. COLLINS - SBN 185427
collinskt@gtlaw.com
M. THERESA TOLENTINO MEEHAN – SBN 204112
meehant@gtlaw.com
THOMAS A. WOODS – SBN 2100050
woodsto@gtlaw.com
GREENBERG TRAURIG, LLP
1201 K Street, Suite 1100
Sacramento, CA  95814-3938
Telephone:  (916) 442-1111
Facsimile:  (916) 448-1709

CLEM C. TRISCHLER
*Admitted Pro Hac Vice*
PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI, LLP
One Oxford Centre, 38th Floor
Pittsburgh, PA  15219
Telephone:  (412) 263-2000
Facsimile:  (412) 263-2001
cct@pietragallo.com

Attorneys for Defendants
Mylan Inc.; Mylan Pharmaceuticals Inc.;
Mylan Technologies Inc.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| ELEANOR O'SULLIVAN,<br><br>    Plaintiff,<br><br>v.<br><br>MYLAN, INC.;<br>MYLAN PHARMACEUTICALS, INC.; and<br>MYLAN TECHNOLOGIES, INC.,<br><br>    Defendants. | CASE NO.  2:09-cv-01475-JAM-GGH<br><br>NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION; MEMORANDUM OF POINTS AND AUTHORITIES<br><br>[Filed Concurrently With:<br>1.  Statement of Undisputed Facts; and,<br>2.  Declaration Clem Trischler.]<br><br><u>Hearing:</u><br>Date:      December 8, 2010<br>Time:     9:00 a.m.<br>Crtrm:    6<br>Judge:    John A. Mendez |

SAC 441,857,162 v2 121612.010200

Case No. 2:09-cv-01475-JAM-GGH

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE,
SUMMARY ADJUDICATION; MEMORANDUM OF POINTS AND AUTHORITIES

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

NOTICE OF MOTION AND MOTION .................................................................. v

MEMORANDUM OF POINTS AND AUTHORITIES ......................................... 1

1. INTRODUCTION .......................................................................................... 1

2. BACKGROUND ............................................................................................ 1

3. LEGAL STANDARDS: SUMMARY JUDGMENT ................................... 3

4. ARGUMENT ................................................................................................. 4

    A. THE MYLAN DEFENDANTS ARE ENTITLED TO SUMMARY
    JUDGMENT ON PLAINTIFF'S STRICT LIABILITY CLAIMS ................. 4

        i. Strict Liability – Design Defect ............................................................ 4

        ii. Strict Liability – Marketing Defect ..................................................... 6

        iii. Strict Liability – Manufacturing Defect ............................................. 11

    B. THE MYLAN DEFENDANTS ARE ENTITLED TO SUMMARY
    JUDGMENT ON PLAINTIFF'S NEGLIGENT FAILURE TO WARN AND
    NEGLIGENT MISREPRESENTATION CLAIMS ..................................... 16

        i. Negligent Failure-to-Warn and Negligent Misrepresentation: Information
        Provided to the FDA .......................................................................... 16

        ii. Negligent Failure-to-Warn: Information Provided to the Decedent or the
        Public ................................................................................................. 17

        iii. Negligent Misrepresentation: Information Provided to the Decedent or
        the Public ........................................................................................... 18

        iv. Negligent Failure-to-Warn and Negligent Misrepresentation: Information
        Provided to the Prescribing Physician ............................................... 19

    C. THE MYLAN DEFENDANTS ARE ENTITLED TO SUMMARY
    JUDGMENT ON PLAINTIFF'S REMAINING NEGLIGENCE CLAIMS . 20

    D. THE MYLAN DEFENDANTS ARE ENTITLED TO SUMMARY
    JUDGMENT ON PLAINTIFF'S BREACH OF WARRANTY CLAIMS .... 23

5. CONCLUSION ........................................................................................... 25

1

## TABLE OF AUTHORITIES

2

### CASES

3

4

*Aaron v. Wyeth*,
   No. 2:07cv927, 2010 U.S. Dist. LEXIS 14581 (W.D. Pa. Feb. 19, 2010) ............................ 8

*Adams v. I-Flow Corp.*,
   Case No. CV09-09550 R (SSx), 2010 U.S. Dist. LEXIS 33066 (C.D. Cal. Mar. 30, 2010) 5,
   17, 18, 19, 25

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ................................................................................................. 3, 4

*Anderson v. Owens-Corning Fiberglas Corp.*,
   53 Cal. 3d 987, 281 Cal. Rptr. 528, 810 P.2d 549 (1991) .................................................. 17

*Arpin v. Santa Clara Valley Transp. Agency*,
   261 F.3d 912 (9th Cir. 2001) .......................................................................................... 4

*Artiglio v. Gen. Elec.*,
   61 Cal. App. 4th 830, 71 Cal. Rptr. 2d 817 (Ct. App. 1998)................................................ 6

*Barker v. Lull Eng'g Co.*,
   20 Cal. 3d 413, 143 Cal. Rptr. 225, 573 P.2d 443 (1978) ............................................. 5, 11

*Bily v. Arthur Young & Co.*,
   3 Cal. 4th 370 (Cal. 1992) ........................................................................................... 18

*Blanco v. Baxter Healthcare Corp.*,
   158 Cal. App. 4th 1039, 70 Cal. Rptr. 3d 566 (2008) ................................................ 24, 25

*Brown v. Superior Court*,
   44 Cal. 3d 1049 (Cal. 1988) .......................................................................... vi, 5, 17, 23

*Buckman Co. v. Plaintiffs' Legal Comm.*,
   531 U.S. 341 (2001) ....................................................................................... v, 16, 17

*Carlin v. Superior Court*,
   13 Cal. 4th 1104 (Cal. 1996) .............................................................................. 7, 9, 11

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ..................................................................................................... 3

*Chandler v. Chiron Corp.*,
   No. C-96-1047 SI, 1997 U.S. Dist. LEXIS 11251 (N.D. Cal. July 28, 1997)..................... 24

*Charnay v. Cobert*,
   145 Cal. App. 4th 170, 51 Cal. Rptr. 3d 471 (Cal. Ct. App. 2006) ............................... vi, 19

*Conte v. Wyeth, Inc.*,
   168 Cal. App. 4th 89 (Cal. App. 1st Dist. 2008) .............................................................. 19

*Cox v. DePuy Motech, Inc.*,
   95-CV-3848-L(JA), 2000 U.S. Dist. LEXIS 22849 (S.D. Cal. Mar. 29, 2000)................... 24

*Evraets v. Intermedics Intraocular, Inc.*,
   29 Cal. App. 4th 779 (Cal. App. 2d Dist. 1994)....................................................iv, vii, 7, 24

*Fender v. Medtronic, Inc.*,
   887 F. Supp. 1326 (E.D. Cal. 1995) ........................................................................ vi, 21

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Fox v. Pollack*,
   181 Cal. App. 3d 954, 226 Cal. Rptr. 532 (1986) ........................................................... vi, 19

*Gonzalez v. Autoliv ASP, Inc.*,
   154 Cal. App. 4th 780, 64 Cal. Rptr. 3d 908 (Ct. App. 2007)........................................... 17

*Harrison v. Sofamor-Danek Group*,
   Case No. 94-CV-0692-K (JAH), 1998 U.S. Dist. LEXIS 13430
   (S.D. Cal. July 14, 1998) ........................................................................................ 15, 20

*Hernandez v. Spacelabs Med., Inc.*,
   343 F.3d 1107 (9th Cir. 2003) ............................................................................................ 4

*Hinckley v. La Mesa R.V. Center, Inc.*,
   158 Cal. App. 3d 630, 205 Cal. Rptr. 22 (Cal. Ct. App. 1984) ........................................ 12

*Hufft v. Horowitz*,
   4 Cal. App. 4th 8, 5 Cal. Rptr. 2d 377 (Cal. Ct. App. 1992) ....................................... 5, 23

*Huntman v. Danek Medical, Inc.*,
   1998 U.S. Dist. LEXIS 13431, 1998 WL 663362 (S.D. Cal. 1998) ...................... 10, 18, 24

*Jenkins v. T&N Plc*,
   45 Cal. App. 4th 1224 (Cal. App. 2d Dist. 1996)............................................................. 21

*Jennings v. Palomar Pomerado Health Systems, Inc.*,
   114 Cal. App. 4th 1108, 8 Cal. Rptr. 3d 363 (2003) ........................................................ 15

*Johnson v. Am. Std., Inc.*,
   43 Cal. 4th 56, 74 Cal. Rptr. 3d 108, 179 P.3d 905 (2008)................................................ 6

*Jones v. Ortho Pharm. Corp.*,
   163 Cal. App. 3d 396 (Cal. App. 2d Dist. 1985) .......................................................... v, 15

*Karlsson v. Ford Motor Co.*,
   140 Cal. App. 4th 1202, 45 Cal. Rptr. 3d 265 (Ct. App. 2006)........................................... 4

*Khan v. Shiley Inc.*,
   217 Cal. App. 3d 848, 266 Cal. Rptr. 106 (1990) ........................................................... 21

*Latiolais v. Merck & Co.*,
   302 F. App'x 756 (9th Cir. 2008)...................................................................................... 10

*Little v. Depuy Motech, Inc.*,
   Civil No. 96cv0393-L(JAH), 2000 U.S. Dist. LEXIS 22698 (S.D. Cal. June 9, 2000)......... 9

*Maneely v. General Motors Corp.*,
   108 F.3d 1176 (9th Cir. 1997)............................................................................................ 7

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) .......................................................................................................... 4

*McCabe v. Am. Honda Motor Co.*,
   100 Cal. App. 4th 1111, 123 Cal. Rptr. 2d 303 (Ct. App. 2002)........................................ 11

*Merrill v. Navegar, Inc.*,
   26 Cal. 4th 465, 110 Cal. Rptr. 2d 370, 28 P.3d 116 (2001)........................................ 5, 17

*Miller v. Baxter Healthcare Corp.*,
   165 F. App'x 550 (9th Cir. 2006)...................................................................................... 16

*Motus v. Pfizer, Inc.*,
   358 F.3d 659 (9th Cir. 2004) ........................................................................................ v, 10

*Nelson v. Superior Court*,
   144 Cal. App. 4th 689, 50 Cal. Rptr. 3d 684 (Ct. App. 2006)............................................. 4

*Phillippi v. Stryker Corp.*,
    No. 2:08-CV-02445-JAM-KJN, 2010 U.S. Dist. LEXIS 66470
    (E.D. Cal. June 30, 2010) .............................................................................................. vi, 22

*Plenger v. Alza Corp.*,
    11 Cal. App. 4th 349 (Cal. App. 4th Dist. 1992) ............................................................. 5, 9

*Ramirez v. Plough, Inc.*,
    6 Cal. 4th 539 (Cal. 1993) ................................................................................................... 11

*Rivera v. AMTRAK*,
    331 F.3d 1074 (9th Cir. 2003) ............................................................................................ 3, 4

*Romito v. Red Plastic Co.*, Inc.,
    38 Cal. App. 4th 59 (1995) ................................................................................................... 19

*Rosburg v. Minnesota Min & Mfg. Co.*,
    181 Cal. App. 3d 726, 226 Cal. Rptr. 299 (1986) ............................................................... 10

*Rutherford v. Owens-Illinois, Inc.*,
    16 Cal. 4th 953, 67 Cal. Rptr. 2d 16, 941 P.2d 1203 (1997) .............................................. 10

*Salyards v. Metso Minerals Tampere Oy*,
    No. 1:04-CV-05798 OWW LJO, 2005 U.S. Dist. LEXIS 29360 (E.D. Cal. Nov. 10, 2005) 7

*Sparks v. Owens-Illinois, Inc.*,
    32 Cal. App. 4th 461 (Ct. App. 1995) .................................................................... 12, 15, 21

*Toole v. Richardson-Merrell. Inc.*,
    251 Cal. App. 2d 689, 60 Cal. Rptr. 398 (1967) ........................................................ vii, 24

*Valentine v. Baxter Healthcare Corp.*,
    68 Cal. App. 4th 1467, 81 Cal. Rptr. 2d 252 (Cal. Ct. App. 1999) ............................. v, 7, 22

*Williams v. Beechnut Nutrition Corp.*,
    185 Cal. App. 3d 135, 229 Cal. Rptr. 605 (1986) .............................................................. 24

## STATUTES

Federal Rule of Civil Procedure, rule 56(c) .............................................................................. 3

Federal Rules of Civil Procedure, rule 56 .................................................................... iv, vii, 1

Federal Rules of Civil Procedure, rule 56(c)(2) ........................................................................ 3

Federal Rules of Civil Procedure, rule 56(e)(2) ........................................................................ 3

Federal Rules of Civil Procedure, rule 9(b) ............................................................................. 19

1

## NOTICE OF MOTION AND MOTION

2

3   TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

4           PLEASE TAKE NOTICE that on December 8, 2010, at 9:00 a.m., or as soon thereafter

5   as counsel may be heard, in Courtroom 6 of the above-entitled Court located at 501 I Street,

6   Sacramento, California, Defendants Mylan Inc.; Mylan Pharmaceuticals Inc.; and Mylan

7   Technologies Inc. (hereinafter collectively referred to as "Mylan" or "Mylan Defendants"),

8   will, and hereby move, this Court pursuant to Federal Rules of Civil Procedure, rule 56, for

9   summary judgment or, in the alternative, summary adjudication, on each and every claim

10  brought by Plaintiff Eleanor Sullivan ("Plaintiff").  The Mylan Defendants submit that there

11  exists no genuine issue of material fact and that they are entitled to judgment as a matter of law, or

12  in the alternative, summary adjudication as follows:

13      1.      Plaintiff's strict liability design defect claim fails as a matter of law because:

14          a.      Controlling precedent unequivocally bars design defect claims against
15                  pharmaceutical manufacturers.  See *Brown v. Superior Court*, 44 Cal. 3d
                    1049, 1069 (Cal. 1988).
16
            b.      Even if California law recognized such claims, Plaintiff has not
17                  presented sufficient evidence to establish the foundational fact to support
                    her sole design defect theory, namely that Decedent had highly
18                  permeable or compromised skin

19      2.      Plaintiff's strict liability marketing defect claim fails as a matter of law, because:

20          a.      The learned intermediary doctrine, recognized under California law,
21                  precludes recovery for marketing defect claims where the prescribing
                    physician knew and understood the risks associated with the medication
22                  prescribed to the decedent.  *See Evraets v. Intermedics Intraocular, Inc.*,
                    29 Cal. App. 4th 779, 793 (Cal. App. 2d Dist. 1994).  In this case,
23                  Decedent's prescribing physician was well aware of the risks associated
                    with the Mylan Fentanyl Transdermal System® ("MFTS"), an FDA-
24                  approved drug indicated for the treatment of moderate to severe chronic
                    pain, and used his education, experience, and training to make an
25                  informed prescribing decision.  Therefore, Plaintiff has not presented
                    sufficient evidence to create an issue of material fact as to the adequacy
26                  of the warnings provided by the Mylan Defendants.

27
            b.      Decedent's prescribing physician testified that he did not read or rely on
28                  the labeling and warnings provided by the Mylan Defendants in making

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE,
SUMMARY ADJUDICATION; MEMORANDUM OF POINTS AND AUTHORITIES

his prescribing decisions.  Therefore, Plaintiff has not demonstrated the required element of causation.  *See Motus v. Pfizer, Inc.*, 358 F.3d 659, 661 (9th Cir. 2004).

2.  Plaintiff's strict liability manufacturing defect claim fails as a matter of law, because:

a.  There is no competent evidence that the particular MFTS allegedly worn by Decedent was defective.  Plaintiff's expert—Bret Berner—assumes a defect in the MFTS caused Decedent's injury, then works backwards to concoct hypothetical scenarios to support his assumption.  Plaintiff has made no attempt to connect her expert's equivocal, untested theories to the MFTS allegedly worn by Decedent.

b.  There is no competent evidence that the MFTS allegedly worn by Decedent caused her death.  Plaintiff's expert's opinion amounts to an invitation to the jury to speculate whether a hypothetical defect in the MFTS *may* have caused Decedent's injury.  Such guesswork is impermissible under California law, which demands that causation be proven to a reasonable degree of medical probability.  *See Jones v. Ortho Pharm. Corp.*, 163 Cal. App. 3d 396, 402-03 (Cal. App. 2d Dist. 1985).

3.  Plaintiff's negligence claims fail as a matter of law, because:

a.  To the extent Plaintiff seeks to recover based on allegations that the Mylan Defendants provided incomplete or misleading information to the FDA, such claims are preempted by federal law.  *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 348 (2001).

b.  To the extent Plaintiff seeks to recover based on allegations that the Mylan Defendants provided incomplete or misleading information to the Decedent or the public, such claims are invalid under California's learned intermediary doctrine.  A pharmaceutical manufacturer's duty to warn runs to the physician, not the patient or the public.  *See Valentine v. Baxter Healthcare Corp.*, 68 Cal. App. 4th 1467, 1483, 81 Cal. Rptr. 2d 252, 263 (Cal. Ct. App. 1999).

c.  To the extent Plaintiff seeks to recover based on allegations that the Mylan Defendants provided incomplete or misleading information to Decedent's prescribing physician, such claims fail for the same reasons Plaintiff's marketing defect claim is defective: Plaintiff has not presented competent evidence to create an issue of material fact regarding adequacy of the warnings and causation.  The prescribing physician knew of the risks associated with the MFTS and never read or relied upon any warnings or labeling provided by the Mylan Defendants.

d.  To the extent Plaintiff seeks to recover based on allegations that the MFTS was negligently designed, such claims fail because Plaintiff has

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE,
SUMMARY ADJUDICATION; MEMORANDUM OF POINTS AND AUTHORITIES

not come forward with any evidence to establish the foundational fact for her sole design defect theory, namely that Decedent had highly permeable or compromised skin.  To the contrary, even Plaintiff's expert acknowledges that Decedent did not have highly permeable skin and that there is no evidence that Decedent had compromised skin.

e.   To the extent Plaintiff seeks to recover based on allegations that the MFTS was negligently manufactured, such claims fail for the same reasons her manufacturing defect claim is defective: Plaintiff has presented competent evidence to prove the essential elements of breach and causation.  *See Fender v. Medtronic, Inc.*, 887 F. Supp. 1326, 1333 (E.D. Cal. 1995).  Plaintiff's expert's theories are equivocal and untested, and even Plaintiff's expert acknowledges there is no evidence that any alleged manufacturing defects were present in the MFTS allegedly worn by Decedent.

f.   To the extent Plaintiff seeks to recover based on allegations that the Mylan Defendants were negligent in their testing of the MFTS, such claims are not recognized under California law due to their speculative nature.  *See Phillippi v. Stryker Corp.*, No. 2:08-CV-02445-JAM-KJN, 2010 U.S. Dist. LEXIS 66470 at *5-6 (E.D. Cal. June 30, 2010).

4.   Plaintiff's negligent misrepresentation claims fail as a matter of law, because:

a.   To the extent Plaintiff seeks to recover based on allegations that the Mylan Defendants provided incomplete or misleading information to the Decedent or the public, Plaintiff has failed to present even a scintilla of evidence that the Mylan Defendants made *any* representations to the Decedent, let alone false or misleading information.  Further, Plaintiff has not presented any evidence to demonstrate how Decedent relied on such unidentified misrepresentations.  *See Fox v. Pollack*, 181 Cal. App. 3d 954, 962, 226 Cal. Rptr. 532 (1986).

b.   To the extent Plaintiff seeks to recover based on allegations that the Mylan Defendants provided incomplete or misleading information to Decedent's prescribing physician, Plaintiff has failed to put forth any evidence that any information provided was false.  Further, Plaintiff has failed to provide evidence to prove that the prescribing physician relied upon any allegedly false or misleading representations.  *See Charnay v. Cobert*, 145 Cal. App. 4th 170, 51 Cal. Rptr. 3d 471, 482 (Cal. Ct. App. 2006).  To the contrary, Decedent's prescribing physician neither read nor relied upon any information provided by the Mylan Defendants.

5.   Plaintiff's breach of warranty claims fail as a matter of law, because:

a.   California law does not recognize express or implied warranty claims against prescription drug manufacturers.  *See Brown v. Superior Court*, 44 Cal. 3d 1049, 1071-72 (Cal. 1988).

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION; MEMORANDUM OF POINTS AND AUTHORITIES

b.   Even if California law recognized such claims, Plaintiff's breach of warranty claims fail because Decedent did not rely on any warranties provided by the Mylan Defendants.  Instead, Decedent relied on her prescribing physician to use his education, knowledge, and experience to make an informed decision on her behalf.  *See Toole v. Richardson-Merrell. Inc.*, 251 Cal. App. 2d 689, 706-08, 60 Cal. Rptr. 398 (1967); *and Evraets v. Intermedics Intraocular, Inc.*, 29 Cal. App. 4th 779, 788 (1994).

This Motion is made pursuant to Federal Rules of Civil Procedure, rule 56, and on the grounds that there are no triable issues of material fact and the Mylan Defendants are entitled to summary judgment or, in the alternative, summary adjudication as detailed above as a matter of law.

This Motion is based upon this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Statement of Undisputed Material Facts, the Declaration of Clem C. Trischler, all pleadings and papers on file in this action, and upon such other matters as may be presented to the Court at the time of the hearing.

Dated:  November 3, 2010

PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI, LLP


By:/s/ Clem C. Trischler
Clem C. Trischler,
*Admitted Pro Hac Vice*
Attorneys for Defendants
Mylan Inc.; Mylan Pharmaceuticals Inc.; and Mylan Technologies Inc.

*SAC 441,857,162 v2 121612.010200*                    viii                    Case No. 2:09-cv-01475-JAM-GGH

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION; MEMORANDUM OF POINTS AND AUTHORITIES

1                   <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

2        1.     <u>INTRODUCTION</u>

3        AND NOW come the Defendants, Mylan Inc., Mylan Pharmaceuticals Inc. ("MPI"),

4 and Mylan Technologies Inc. ("MTI") (hereinafter collectively referred to as "Mylan" or

5 "Mylan Defendants"), and respectfully submit this Memorandum of Points and Authorities in

6 Support of Mylan's Motion for Summary Judgment, or in the alternative Summary

7 Adjudication. The undisputed facts demonstrate that Mylan is entitled to judgment as a matter

8 of law on each claim of liability for the death of Jan Marie O'Sullivan ("Decedent"), and thus,

9 pursuant to Federal Rules of Civil Procedure, rule 56, this Court should grant Mylan's Motion.

10        2.     <u>BACKGROUND</u>

11        This is a product liability suit stemming from the death of Jan Marie O'Sullivan.

12 Decedent was found dead in her apartment on July 4, 2007, though it is unclear exactly when

13 she died. Statement of Undisputed Material Facts ["SUMF"] ¶ 1. Plaintiff alleges that, at the

14 time of her death, Decedent was wearing a 50 µg/hour Mylan Fentanyl Transdermal System®

15 ("MFTS"). The crux of Plaintiff's claims is that the MFTS is defective, and such defects

16 caused the death of Decedent. Plaintiff seeks recovery of damages on a variety of theories,

17 including strict liability (manufacturing defect; marketing defect), negligence, negligent

18 misrepresentation, and breach of warranty.

19        The MFTS is an FDA-approved drug indicated for the treatment of persistent moderate

20 to severe chronic pain. SUMF ¶ 2. The MFTS operates by delivering fentanyl, an opioid

21 analgesic, through the skin. *Id.* The FDA approved Mylan's Abbreviated New Drug

22 Application ("ANDA") in 2005. In order to be marketed in the United States, a generic drug

23 must be deemed "bioequivalent" to a reference listed (brand name) drug. The Duragesic®

24 patch, manufactured by subsidiaries of Johnson & Johnson, is the reference listed drug for the

25 MFTS. FDA rules and regulations mandate that warnings and labeling of generic drugs be

26 substantively identical to their reference listed drug. SUMF ¶ 3.

27        Prior to her death, Decedent had a long history of physical and emotional problems. In

28 1998, her medical records stated that she "has a history of alcohol and narcotic abuse." SUMF

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE,
SUMMARY ADJUDICATION; MEMORANDUM OF POINTS AND AUTHORITIES

¶ 5.  She had been using fentanyl patches since at least 2002.  SUMF ¶ 6.  Decedent suffered from, *inter alia*, bronchitis, fibromyalgia, depression, bipolar disorder, obesity, tobacco addiction, back pain, knee pain, sciatica, sleep disorder, chronic pain, asthma, and anxiety.  *Id.*  She had used a variety of psychiatric medications since 1994.  SUMF ¶ 5.

Decedent lived with her boyfriend, Jeremy Traub, from June 2002 through March 2006.  SUMF ¶ 7.  According to Traub, Decedent had a "drug problem."  *Id.*  In his mind, Decedent had "traded one addiction for another, and she went from drinking to prescription drugs."  *Id.*  Around 2004-05, Traub recalled an instance when he was unable to wake Decedent, stating that it was "pretty clear that she had taken a lot of medications …"  *Id.*  When she finally awoke, Decedent seemed "intoxicated" from her medication, with slurred speech and an unsteady gait.  *Id.*

By 2005, Decedent was "well known to [Kaiser Permanente] Psychiatry from clinic and frequent ED visits."  SUMF ¶ 8.  On multiple occasions, she informed medical providers of her intentions to overdose on her prescription medications, and had attempted suicide by overdosing at least once in the past.  *Id.*  Further, she stated that her boyfriend broke up with her as a "result of his belief that she abuses her pain meds."  SUMF ¶ 9.  Decedent was also inconsistent with her medications and disobeyed orders from her physicians.  SUMF ¶ 10.

Decedent's physical and mental health continued to deteriorate in 2006.  SUMF ¶ 11.  Decedent was involved in a car accident and arrested for DUI in May 2006, stating that she "took too many pills."  SUMF ¶ 12.  Police placed her on involuntary psychiatric hold.  *Id.*  Later that year, she presented to the emergency room, reporting, "[S]he has been hoarding medication w/ plan to OD."  *Id.*  She was again placed on involuntary psychiatric hold.  *Id.*  By 2007, Traub believed Decedent had "lost her spirit to live" and was on a "downward spiral" due to her drug use.  SUMF ¶ 13.

Traub found Decedent dead on July 4, 2007.  Traub last saw Decedent alive 12 days earlier.  SUMF ¶ 14.  Officer Spears, of the Vallejo Police Department, noted, "Due to the condition of the [Decedent] – it was apparent she had died several days ago."  SUMF ¶ 15.  A toxicology screen found the following in Decedent's blood: ethyl alcohol, codeine, morphine,

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE,
SUMMARY ADJUDICATION; MEMORANDUM OF POINTS AND AUTHORITIES

1   hydrocodone, fentanyl, and diphenhydramine.   SUMF ¶ 16.   At Decedent's apartment,

2   investigators found Imitrex, Warfarin, Phenergan, Prozac, Clonazepam, Meclizine, Lovenox,

3   Chloramphenicol, Advair, Albutirol, Acetaminophen/Codeine, Diphenhydramine, Duloxetine,

4   Fentanyl, Fluticasone, Seroquel, Carisoprodol, Methocarbamol, Doxycycline, and Cymbalta.

5   SUMF ¶ 17.

6         3.     LEGAL STANDARDS: SUMMARY JUDGMENT

7         Federal Rule of Civil Procedure, rule 56(c) states that summary judgment is proper if

8   the record shows "that there is no genuine issue as to any material fact and that the movant is

9   entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  A genuine issue of material

10  fact exists "if the evidence is such that a reasonable jury could return a verdict for the

11  nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party

12  seeking summary judgment "bears the initial responsibility of informing the district court of the

13  basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to

14  interrogatories, and admissions on file, together with the affidavits, if any,' which it believes

15  demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477

16  U.S. 317, 323 (1986).

17        Once the moving party meets its responsibility, the burden then shifts to the nonmoving

18  party to "set out specific facts showing that there is a genuine issue for trial."  Fed. R. Civ.

19  P. 56(e)(2).  *See also Celotex*, 477 U.S. at 322 ("[T]he plain language of Rule 56(c) mandates

20  the entry of summary judgment, after adequate time for discovery and upon motion, against a

21  party who fails to make a showing sufficient to establish the existence of an element essential

22  to that party's case, and on which that party will bear the burden of proof at trial.").  "In order

23  to show that a genuine issue of material fact exists, the nonmoving party must introduce some

24  significant probative evidence tending to support the complaint."  *Rivera v. AMTRAK*, 331 F.3d

25  1074, 1078 (9th Cir. 2003) (quoting *Anderson*, 477 U.S. at 249) (internal quotations omitted).

26  If the moving party can meet his burden of production, the non-moving party "must produce

27  evidence in response …. [H]e cannot defeat summary judgment with allegations in the

28  complaint, or with unsupported conjecture or conclusory statements."  *Hernandez v. Spacelabs*

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE,
SUMMARY ADJUDICATION; MEMORANDUM OF POINTS AND AUTHORITIES

1    *Med., Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).  "Conclusory allegations unsupported by

2    factual data cannot defeat summary judgment."  *Rivera*, 331 F.3d at 1078 (citing *Arpin v. Santa*

3    *Clara Valley Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001)).

4         The nonmoving party must offer more than a mere "scintilla of evidence" that a genuine

5    issue of material fact exists.  *Anderson*, 477 U.S. at 252.  Put differently, a genuine dispute

6    requires more than a showing of "some metaphysical doubt" as to material facts.  *Matsushita*

7    *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "[T]here must be evidence

8    on which the jury could reasonably find for the plaintiff.  The judge's inquiry, therefore,

9    unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that

10   the plaintiff is entitled to a verdict."  *Anderson*, 477 U.S. at 252.

11      4.    <u>ARGUMENT</u>

12        A.    <u>THE MYLAN DEFENDANTS ARE ENTITLED TO SUMMARY</u>

13             <u>JUDGMENT ON PLAINTIFF'S STRICT LIABILITY CLAIMS</u>

14          i.    <u>Strict Liability – Design Defect</u>

15        California law provides that a manufacturer may be held strictly liable for injuries

16   caused by its product "(1) if the product is defectively manufactured; (2) if it is defectively

17   designed; or (3) if it is distributed without sufficient warnings or instructions about its potential

18   for harm."  *Karlsson v. Ford Motor Co.*, 140 Cal. App. 4th 1202, 1208, 45 Cal. Rptr. 3d 265,

19   270 (Ct. App. 2006).  "The elements of a strict products liability cause of action are a defect in

20   the manufacture or design of the product or a failure to warn, causation, and injury."  *Nelson v.*

21   *Superior Court*, 144 Cal. App. 4th 689, 695, 50 Cal. Rptr. 3d 684, 687-88 (Ct. App. 2006).  The

22   "plaintiff must ordinarily show: (1) the product is placed on the market; (2) there is knowledge

23   that it will be used without inspection for defect; (3) the product proves to be defective; and

24   (4) the defect causes injury."  *Id.* (citations, quotation marks, emphasis, and modification

25   omitted).

26        "In a strict liability action based on defective design, 'a product is defective … either

27   (1) if the product has failed to perform as safely as an ordinary consumer would expect when

28   used in an intended or reasonably foreseeable manner, or (2) if … the benefits of the challenged

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE,
SUMMARY ADJUDICATION; MEMORANDUM OF POINTS AND AUTHORITIES

1  design do not outweigh the risk of danger inherent in such design." *Merrill v. Navegar, Inc.*, 26

2  Cal. 4th 465, 479, 110 Cal. Rptr. 2d 370, 28 P.3d 116, 125 (2001) (citing *Barker v. Lull Eng'g*

3  *Co.*, 20 Cal. 3d 413, 418, 143 Cal. Rptr. 225, 573 P.2d 443 (1978)).

4         However, an exception to this general doctrine of strict liability for design defects

5  applies to manufacturers of prescription drugs and medical devices.  *See Hufft v. Horowitz*, 4

6  Cal. App. 4th 8, 16-18, 5 Cal. Rptr. 2d 377 (Cal. Ct. App. 1992).   Prescription drug

7  manufacturers cannot be held strictly liable for design defects.  *See Brown v. Superior Court*,

8  44 Cal. 3d 1049, 1069 (Cal. 1988) ("[W]e hold that a manufacturer is not strictly liable for

9  injuries caused by a prescription drug so long as the drug was properly prepared and

10  accompanied by warnings of its dangerous propensities that were either known or reasonably

11  scientifically knowable at the time of distribution.").  *Accord Plenger v. Alza Corp.*, 11 Cal.

12  App. 4th 349, 357 (Cal. App. 4th Dist. 1992) ("The Supreme Court [in *Brown*] held that a

13  manufacturer of a prescription drug could not be held strictly liable under a design defect

14  theory."); *and Adams v. I-Flow Corp.*, Case No. CV09-09550 R (SSx), 2010 U.S. Dist. LEXIS

15  33066 at *15 (C.D. Cal. Mar. 30, 2010) ("Controlling California law unequivocally bars strict

16  liability claims for design defect against pharmaceutical manufacturers.") (citations omitted).

17         As an FDA-approved drug (SUMF ¶ 2), the MFTS indisputably falls within the gambit

18  of *Brown's* immunity from design defect claims.  Therefore, to the extent Plaintiff seeks to hold

19  the Mylan Defendants strictly liable for an allegedly defective design, such claims are invalid

20  as a matter of law.[1]  Summary judgment must be granted in favor of the Mylan Defendants.

21         Furthermore, even if California law recognized design defect claims against

22  prescription drug manufacturers, Plaintiff's claim would still fail.  Plaintiff hired a purported

23  transdermal delivery expert, Bret Berner, Ph.D., to explain how the MFTS is defectively

24  _____

25  [1]  It is unclear whether Plaintiff seeks recovery based on a strict liability theory of design
    defect.  The Complaint does not specifically list the claim, but makes numerous references that
26  could be construed as an assertion of a design defect claim.  *See* Comp. ¶ 12 (Defendants
    "engaged in the business of designing … the Patch"; patch was "in a defective condition at the
27  time it was designed"; "exposure to risk of injury from the O'Sullivan Patch outweighed any
    benefits from the product's use"; "Patch was defective because it malfunctioned and did not
28  perform as intended and designed.").

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE,
SUMMARY ADJUDICATION; MEMORANDUM OF POINTS AND AUTHORITIES

1   designed.  See Expert Report of Bret Berner, Ph.D. ["Berner Report"] attached as Ex. H to

2   Declaration of Clem Trischler [Trischler Decl.].[2]   Dr. Berner opines that the MFTS is

3   defectively designed because it "lacks a suitable membrane or other comparable rate control to

4   prevent excessive fentanyl delivery through highly permeable skin or compromised skin."

5   Berner Report 2.

6         Thus, Berner's "theory" is relevant only to the extent a person wearing the MFTS

7   actually has highly permeable or compromised skin.   However, Berner acknowledges that

8   "highly permeable skin is not an issue with respect to Ms. O'Sullivan," because she had been

9   using the MFTS for six months without a problem.  SUMF ¶ 18.  In addition, Berner admitted

10  that there is absolutely no evidence that Decedent had compromised skin where she allegedly

11  placed a MFTS.   *Id.*   Therefore, putting aside Berner's flawed methods and erroneous

12  conclusions, it is clear that his speculative theory of design defect has no applicability to this

13  case.  Summary judgment is proper.

14            ii.    Strict Liability – Marketing Defect

15        "Generally speaking, manufacturers have a duty to warn consumers about the hazards

16  inherent in their products."  *Johnson v. Am. Std., Inc.*, 43 Cal. 4th 56, 64, 74 Cal. Rptr. 3d 108,

17  179 P.3d 905, 910 (2008) (citation omitted).

18            In California "the manufacturer has a duty to use reasonable care
              to give warning of the dangerous condition of the product or of
19            facts which make it likely to be dangerous to those whom he
              should expect to use the product or be endangered by its probable
20            use, if the manufacturer has reason to believe that they will not
              realize its dangerous condition."
21

22  *Artiglio v. Gen. Elec.*, 61 Cal. App. 4th 830, 835, 71 Cal. Rptr. 2d 817, 819 (Ct. App. 1998)

23  (citations omitted).   "The requirement's purpose is to inform consumers about a product's

24  hazards and faults of which they are unaware, so that they can refrain from using the product

25  altogether or evade the danger by careful use."  *Johnson*, 43 Cal. 4th at 64.

26

27  [2]  Because much of Dr. Berner's report contains confidential and proprietary information
    relating to the manufacture and development of the MFTS, the Mylan Defendants attach only
28  the portions of his report that are specifically cited.

1    To establish a claim of strict liability for a marketing defect, a plaintiff must prove that

2  "[1] the manufacturer had a duty to warn of the dangers arising from a foreseeable use of the

3  product and [2] that the breach of that duty was the proximate cause of the plaintiff's injuries.

4  When a manufacturer is or should have been aware that a product is unreasonably dangerous

5  absent a warning and such warning is feasible, the manufacturer will be held strictly liable if it

6  fails to give an appropriate and conspicuous warning."  *Maneely v. General Motors Corp.*, 108

7  F.3d 1176, 1179 (9th Cir. 1997) (applying California law).

8    California law recognizes the "learned intermediary" doctrine, which creates an

9  exception to the general rule that manufacturers must warn the ultimate users of products of

10 inherent risks.  In a products liability claim where the product is a drug or medical device

11 which may only be prescribed or used by a physician, the duty to instruct and warn runs to the

12 physician, not to the patient.  *Valentine v. Baxter Healthcare Corp.*, 68 Cal. App. 4th 1467,

13 1483, 81 Cal. Rptr. 2d 252, 263 (Cal. Ct. App. 1999).  *Accord Carlin v. Superior Court*, 13 Cal.

14 4th 1104, 1116 (Cal. 1996) ("[I]n the case of prescription drugs, the duty to warn runs to the

15 physician, not to the patient.").  "The manufacturer cannot be held strictly liable if it has

16 provided adequate warning of known defects or dangers and the doctor fails in his duty to

17 transmit these warnings to the patient."  *Evraets v. Intermedics Intraocular, Inc.*, 29 Cal. App.

18 4th 779, 793 (Cal. App. 2d Dist. 1994).  *See also Salyards v. Metso Minerals Tampere Oy*, No.

19 1:04-CV-05798 OWW LJO, 2005 U.S. Dist. LEXIS 29360 at *25 (E.D. Cal. Nov. 10, 2005)

20 ("[A] prescription drug manufacturer may usually discharge its duty to warn by providing

21 warnings to the prescribing physician, a so-called 'learned intermediary.'  If the doctor fails to

22 read or heed the warning, the manufacturer is absolved of liability.").

23    Plaintiff has not presented sufficient evidence to create an issue of material fact

24 regarding the adequacy of the Mylan Defendants' warnings regarding the MFTS.  The label

25 and warnings for the MFTS were approved by the FDA and are substantively identical to those

26 of the reference listed drug (Duragesic), as required by federal law.  SUMF ¶ 19.  Undeterred,

27 Plaintiff hired a purported regulatory and labeling expert, Linda Motyka, Ph.D., to support

28 inadequate warning claims.  See Expert Report of Linda A. Motyka, Ph.D. [Motyka Report]

1   attached as Ex. J to Trischler Decl.  Motyka opines that the MFTS's label should have included

2   a "statement about the deaths and overdose where there is no evidence of misuse or abuse of

3   the product."  Deposition of Linda Motkya ["Motkya Dep."] 237:23-25 attached as Ex. L to

4   Trischler Decl.

5        Plaintiff's argument that Mylan's warnings were inadequate is invalid for two reasons:

6   (1) the package insert for the MFTS already warned of the risk of death, without reference to

7   misuse or abuse; and (2) the prescribing physician knew that the risk of hypoventilation is a

8   constant concern when prescribing fentanyl, but he accepted those risks in consideration of the

9   particular circumstances of Decedent's treatment.  SUMF ¶¶ 20-21.

10       First, the label for the MFTS already contains the warning Plaintiff's expert now

11   demands.  The package insert for the MFTS states:

12           **Hypoventilation (Respiratory Depression)**: Serious or life-
             threatening hypoventilation may occur at any time during the use
13           of fentanyl transdermal system especially during the initial 24 to
             72 hours following initiation of therapy and following increases
14           in dose.  SUMF ¶ 20.

15   The warning is clear and unequivocal that death can occur *at any time*, without any

16   reference to misuse or abuse.  Yet, in a show of desperation, Dr. Motyka claims that the

17   warning of death "at any time" is actually qualified by the latter portion of the sentence,

18   "especially during the initial 24 to 72 hours."  Motyka Dep. 257:12-22.  Motyka therefore

19   insists that the MFTS's label fails to state that death can occur even in the absence of misuse of

20   the MFTS.  *Id.*  Motyka's position defies both logic and law.  *See Aaron v. Wyeth*, No.

21   2:07cv927, 2010 U.S. Dist. LEXIS 14581 at *24 (W.D. Pa. Feb. 19, 2010) (granting summary

22   judgment in a pharmaceutical failure to warn suit because "[t]he plain language of the warning

23   appears to advise physicians of the specific risk at issue").

24       Second, the prescribing physician in this case, Dr. Paul Rubin, was well aware of the

25   inherent risks associated with fentanyl, yet he relied on his education, training, and experience

26   to accept those risks with regard to Decedent.  SUMF ¶ 21.  In fact, the risk of hypoventilation

27   associated with fentanyl and other opioids is widely recognized in the medical community.  *Id.*

28   Dr. Rubin testified under oath:

| | | |
|---|---|---|
| Q. | Do you agree that one of the risks associated with fentanyl is respiratory depression? |
| A. | Yes. |
| Q. | And I would assume you've known that for a long time, correct? |
| A. | I know it's a risk with any opiate. |
| Q. | And you certainly knew that well before treating Jan O'Sullivan, correct? |
| A. | Yes. |
| Q. | And you—I would assume you also knew long before treating Jan O'Sullivan that in some individuals, fentanyl can slow breathing to the point where fatal respiratory hypoventilation occurs? |
| A. | That can occur with any opiate. |
| Q. | So that's a common risk with all opiates, not just fentanyl? |
| A. | It's not unique to fentanyl, no. |
| Q. | And you didn't need a package insert to tell you that, correct? |
| A. | That's correct. |

See Deposition of Dr. Paul Rubin ["Rubin Dep."] ¶ 57:18-58:13, referenced at SUMF ¶ 21.  Dr. Rubin went on to testify that he continues to prescribe fentanyl and, even through the lens of hindsight, the he believes the MFTS labeling covers "the scope of what I typically rely on to make a decision."  *Id.* at 81:1-9.

Dr. Rubin, along with the rest of the medical community, was aware of the risk of "*fatal respiratory hypoventilation*" when he prescribed fentanyl patches for Decedent.  Because the MFTS warned of the precise risks of which Plaintiff now complains, and Decedent's prescribing physician knew and accepted the risk, the MFTS label is adequate as a matter of law.  *See Carlin*, 13 Cal. 4th at 1116 ("[A] pharmaceutical manufacturer may not be required to provide warning of a risk known to the medical community.") (citation omitted); *Plenger*, 11 Cal. App. 4th at 362 (affirming summary judgment on failure to warn claims) ("We are aware of no authority which requires a manufacturer to warn of a risk which is readily known and apparent to the consumer, in this case the physician.") (citation omitted); *Little v. Depuy Motech, Inc.*, Civil No. 96cv0393-L(JAH), 2000 U.S. Dist. LEXIS 22698 at *24 (S.D. Cal. June 9, 2000) (granting summary judgment to defendant medical device manufacturer on failure to warn claims, because prescribing physician knew of the risks associated with the

1  product and there was no evidence that physician relied on any statements made by defendant);

2  *and Rosburg v. Minnesota Min & Mfg. Co.*, 181 Cal. App. 3d 726, 735, 226 Cal. Rptr. 299

3  (1986) (finding lack of causation on failure to warn claim where doctor knew of risk).

4  Summary judgment should be granted in favor of the Mylan Defendants on Plaintiff's

5  marketing defect claim.

6      Nevertheless, *even if* the MFTS label is not adequate as a matter of law, Plaintiff's

7  marketing defect claims still fail on the element of causation.  "A plaintiff asserting causes of

8  action based on a failure to warn must prove not only that no warning was provided or the

9  warning was inadequate, but also that the inadequacy or absence of the warning caused the

10  plaintiff's injury."  *Motus v. Pfizer, Inc.*, 196 F. Supp. 2d 984, 991 (C.D. Cal. 2001).  To

11  establish such causation under California law, Plaintiffs must prove that the "alleged failure to

12  warn or inadequate warning was a substantial factor" in bringing about Decedent's death.  *Id.*

13  (citing *Rutherford v. Owens-Illinois, Inc.*, 16 Cal. 4th 953, 968, 67 Cal. Rptr. 2d 16, 941 P.2d

14  1203 (1997)).

15      Importantly, where a prescribing physician neither read nor relied on information and

16  warnings provided by the manufacturer, a Plaintiff's marketing defect claims cannot survive

17  summary judgment.  *See Motus v. Pfizer, Inc.*, 358 F.3d 659, 661 (9th Cir. 2004) (stating that

18  an insufficient warnings claim cannot survive summary judgment if stronger warnings would

19  not have altered the prescribing physician's conduct); *Latiolais v. Merck & Co.*, 302 F. App'x

20  756, 757 (9th Cir. 2008) (applying California law and affirming summary judgment on a

21  pharmaceutical failure to warn claim because the prescribing physician did not rely on any

22  information provided by defendant manufacturer); *and Huntman v. Danek Medical, Inc.*, 1998

23  U.S. Dist. LEXIS 13431, 1998 WL 663362 (S.D. Cal. 1998) (granting summary judgment to

24  manufacturer in medical device failure-to-warn case on ground that doctor did not rely on any

25  statements by manufacturer in decision to perform treatment).

26      In this case, Dr. Rubin repeatedly testified that he had neither read the label for the

27  MFTS, nor relied on any representations by the Mylan Defendants:

28          Q.    Okay.   Have  you  ever  read  the  product  labeling  with

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE,
SUMMARY ADJUDICATION; MEMORANDUM OF POINTS AND AUTHORITIES

| | | respect to fentanyl transdermal systems – |
|---|---|---|
| | A. | I don't recall – |
| | Q. | —at any time? |
| | A. | —that I've read the package insert specifically. |
| | **** | |
| | Q. | And I think you indicated that you can't recall ever reading a package insert or full prescribing information for fentanyl transdermal patches; is that correct? |
| | A. | I don't recall specifically reading the -- the actual package insert, that's correct.   As—as I had indicated, I use a number of sources for—for pharmaceutical information, and I don't recall specifically the package insert because I don't routinely look at the actual package inserts.  I tend to go to other sources for information. |
| | Q. | And have you read the package insert specifically for Mylan's fentanyl transdermal system? |
| | A. | I—I—only in reviewing it here today. |
| | Q. | So you don't have any recollection before today of seeing Mylan's full prescribing information? |
| | A. | No, I don't. |

Rubin Dep. 33:14-20, 56:4-23, referenced at SUMF ¶ 22.

In   such   circumstances,   "there   is   no   conceivable   causal   connection   between   the representations or omissions that accompanied the product and plaintiff's injury."  *Ramirez v. Plough, Inc.*, 6 Cal. 4th 539, 556 (Cal. 1993) (dismissing failure to warn claim when plaintiff did not read the warnings).   As Plaintiff cannot prove the essential element of causation, her marketing defect claim cannot survive summary judgment.

iii.   <u>Strict Liability – Manufacturing Defect</u>

"A manufacturing defect occurs when a product does not conform to the manufacturer's intended design."  *Carlin*, 13 Cal. 4th at 1121.  *See also McCabe v. Am. Honda Motor Co.*, 100 Cal. App. 4th 1111, 1120, 123 Cal. Rptr. 2d 303, 309 (Ct. App. 2002) ("A manufacturing defect   exists   when   an   item   is   produced   in   a   substandard   condition").    "In general, a manufacturing or production defect is readily identifiable because a defective product is one that differs from the manufacturer's intended result or from other ostensibly identical units of the same product line."  *Barker*, 20 Cal. 3d at 429.  "[A] plaintiff satisfies his burden of proof … in both a manufacturing defect and design defect context, when he proves the existence of a defect and that such defect was a proximate cause of his injuries."  *Id.* 573 P.2d at 452 (internal

1    quotation marks omitted).

2          Under California law, "a defect in manufacture … must be affirmatively established,

3    and an inference of defect solely from the fact of an accident cannot be drawn." *Hinckley v. La*

4    *Mesa R.V. Center, Inc.*, 158 Cal. App. 3d 630, 642, 205 Cal. Rptr. 22 (Cal. Ct. App. 1984).  "In

5    a personal injury action, causation must be proven within a reasonable medical probability

6    based on expert testimony; a mere possibility is insufficient.   A possible cause becomes

7    'probable' when, in the absence of other reasonable causal explanations, it is more likely than

8    not that the injury resulted from its action."  *Sparks v. Owens-Illinois, Inc.*, 32 Cal. App. 4th

9    461, 476 (Ct. App. 1995) (citations omitted).

10         Based on the foregoing legal standards, Plaintiff's manufacturing defect claim fails for

11   two reasons: Plaintiff has presented (1) insufficient evidence to create a material issue of fact as

12   to whether the particular MFTS allegedly worn by Decedent contained a manufacturing defect,

13   and (2) inadequate evidence to prove that some unspecified manufacturing defect caused

14   Decedent's death.

15         Plaintiff, relying on circular reasoning and conclusory allegations, has not presented

16   sufficient evidence of a manufacturing defect to survive summary judgment.   Plaintiff's

17   Complaint offers little more than a proclamation that the MFTS allegedly worn by Decedent

18   contained a "manufacturing flaw" and "was defective because it malfunctioned …."  Comp.

19   ¶ 13.  Plaintiff returns to her purported transdermal delivery expert, Bret Berner, Ph.D., to

20   provide testimony in support of her manufacturing defect claim.   However, instead of

21   explaining how the particular MFTS allegedly worn by Decedent was defective, Berner merely

22   lists six ways a MFTS *might* hypothetically differ from its intended design:

23              There are at least six other ways that a Mylan fentanyl
               transdermal patch ***can malfunction*** to deliver far too much drug
24             to a patient:  1) presence of a contaminant that alters the skin
               barrier properties to fentanyl, 2) delivery to too large an area of
25             skin resulting from adhesive residue surrounding the patch,
               3) exposure of a patch to excessive heat during transport or
26             storage resulting in a supersaturated solution that is metastable in
               the adhesive matrix, 4) excessive heating and shear during the
27             adhesive –drug mixing process resulting in a supersaturated
               solution that is metastable in the adhesive mix, 5) release of drug
28             into   collected   sweat   or   transepidermal   water   loss,   and

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE,
SUMMARY ADJUDICATION; MEMORANDUM OF POINTS AND AUTHORITIES

6) inclusion of a different polymorph of fentanyl.

Berner Report 12-16; SUMF ¶ 23 (emphasis added).

A closer examination of Berner's theories regarding manufacturing defects reveals that they are the product of conclusory guesswork without any scientific or factual support, and therefore insufficient to create a triable issue of material fact.  First, Berner acknowledges that he essentially *assumes* the ultimate issue he was hired to prove: that the MFTS allegedly worn by Decedent malfunctioned and delivered excessive fentanyl, "I'm making the assumption that the patch is delivering an excessive amount [of fentanyl] … And [the expert report is] really saying *if it malfunctioned*, this is what happened.  Deposition of Bret Berner ["Berner Dep."] 128:20-25; 190:2-14, SUMF ¶ 24 (emphasis added).  Having already concluded there was a malfunction, Berner uses speculation to justify the presumption.  In the process, Berner's opinions become so uncertain and equivocal that they cannot possibly meet the requisite degree of scientific probability required under California law.

For example, when discussing the six (6) "*likely*" ways that the MFTS "*may have malfunctioned*," Dr. Berner wrote:

- "A contaminant *can be* present in the patch that *could* alter the stratum corneum as a barrier to increase the skin permeation of fentanyl."
- "This exposure of product to heat is a common occurrence, and *it can result* in excessive fentanyl delivery from Mylan FTS."
- "With the high shear involved in a colloid mill, there *can be* excessive heating and a supersaturated adhesive solution may be created."
- "The combination of a *possibility* of a supersaturation and the absence of a good method of detection *could* result in excessive fentanyl delivery from Mylan FTS."
- "Both sweat and transepidermal water loss *can* supply significant amounts of water to the Mylan FTS … This *can* result in excessive delivery of drug to the patient, or in other cases in loss of drug."
- "These polymorphs *may* have different melting points and solubilities, and this different solubility is a polymeric matrix *can* result in a greater driving force and increased transport of drug across skin … [O]ne of the two suppliers of fentanyl to Mylan … reported that their mills may melt fentanyl, and this could *potentially* lead to polymorphs."

Berner Report 12-16, SUMF ¶ 23 (emphasis added).

Making matters worse, Berner freely admits that he has never validated any of his

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE,
SUMMARY ADJUDICATION; MEMORANDUM OF POINTS AND AUTHORITIES

1    equivocal opinions or conclusions through testing, and he has never personally examined a

2    MFTS, "I have not done any testing to verify the opinions, that's true."  Berner Dep. 19:1-

3    20:23.  Even more troublesome, Plaintiff's expert has not presented any peer-reviewed studies

4    of fentanyl delivery to support his assertion that these hypothetical defects in the MFTS *might*

5    cause the delivery of a fatal dose of fentanyl.

6           Finally, Berner unabashedly testifies that there is no evidence to connect his speculative

7    theories to the case of Decedent:

8             Q.    You told me that in your opinion she did not have highly
                    permeable skin, correct?
9             A.    Yes.
              Q.    You have no evidence that her skin was compromised in
10                  late June or July of 2007, correct?
11            A.    That's correct.
              Q.    You have no evidence that there was a contaminant in the
12                  patch she was wearing at the time she was found dead,
                    correct?
13            A.    Correct.
              Q.    You have no evidence that there was any adhesive residue
14                  rings on her body that would arguably or potentially
15                  accelerate drug delivery, correct?
              A.    That's correct.
16            Q.    You have no evidence of a polymorph in any of the
                    patch—Mylan fentanyl patches that she was dispensed?
17            A.    Correct.
18            Q.    You have no evidence of a supersaturated condition having
                    been created in the Mylan fentanyl patch that she was
19                  allegedly wearing at the time of her death, correct?
20            A.    Correct.

21   Berner Dep. 178:7-179:21, reference SUMF ¶ 24.  *See also id.*, at 186:24-187:4 ("I can't

22   identify any of them individually as having been present, and … alone they would not explain

23   [Decedent's postmortem fentanyl] level").

24          To summarize Dr. Berner's role in this litigation, he first presumes a malfunction in the

25   MFTS allegedly worn by the Decedent.  He then lists hypothetical defects, which may or may

26   not have been present in Decedent's MFTS.  However, he acknowledges that neither he nor

27   anyone else has ever tested, supported, or verified his theories.  Finally, he admits that there is

28   no evidence that any of these scientifically-unfounded hypothetical defects actually played a

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE,
SUMMARY ADJUDICATION; MEMORANDUM OF POINTS AND AUTHORITIES

1   role in Decedent's death.

2        Dr. Berner's testimony and report do not create a genuine issue of material fact

3   regarding the elements of defect and causation in Plaintiff's manufacturing defect claim.

> The law is well settled that in a personal injury action causation
> must be proven within a reasonable medical probability based
> upon competent expert testimony.  Mere possibility alone is
> insufficient to establish a prima facie case.  That there is a
> distinction between a reasonable medical 'probability' and a
> medical 'possibility' needs little discussion.  There can be many
> possible 'causes,' need, an infinite number of circumstances
> which can produce an injury or disease.  A possible cause only
> becomes 'probable' when, in the absence of other reasonable
> causal explanations, it becomes more likely than not that the
> injury was a result of its action.  This is the outer limit of
> inference upon which an issue may be submitted to the jury.

11  *Jones v. Ortho Pharm. Corp.*, 163 Cal. App. 3d 396, 402-03 (Cal. App. 2d Dist. 1985).  *Accord*

12  *Harrison v. Sofamor-Danek Group*, Case No. 94-CV-0692-K (JAH), 1998 U.S. Dist. LEXIS

13  13430 at *10-11 (S.D. Cal. July 14, 1998) ("Such expert testimony cannot be conjectural given

14  that the 'mere possibility' of causation is insufficient to establish a prima facie case.") (citations

15  omitted); *Sparks*, 32 Cal. App. 4th at 476 ("In a personal injury action, causation must be

16  proven within a reasonable medical probability based on expert testimony; a mere possibility is

17  insufficient.") (citation omitted).

18       Neither Dr. Berner nor any other expert hired by Plaintiff can testify to a reasonable

19  degree of medical probability that any of his six hypothetical, unsubstantiated defects existed in

20  the MFTS allegedly worn by Decedent, or that such speculative defect caused her death.

21  SUMF ¶ 37.  California law demands more than Berner's equivocal statements of possibility.

22  Under California law, a theoretical possibility of causation cannot support an expert's

23  conclusion that the act in question was the cause of the injury.  *Jennings v. Palomar Pomerado*

24  *Health Systems, Inc.*, 114 Cal. App. 4th 1108, 1118, 8 Cal. Rptr. 3d 363 (2003).  As explained

25  by the Ninth Circuit, there is no issue of material fact when an expert "never established a

26  connection between this unidentified 'potential hazard' and the specific [product] used for

27  [Decedent]. Nor did [the expert] ever inspect the [product], so as to obtain some physical

28  evidence of malfunction."  *Miller v. Baxter Healthcare Corp.*, 165 F. App'x 550, 553 (9th Cir.

1   2006) (affirming summary judgment).  The Mylan Defendants request that the Court grant

2   summary judgment on Plaintiff's manufacturing defect claim.

3           B.     **THE MYLAN DEFENDANTS ARE ENTITLED TO SUMMARY**

4                 **JUDGMENT ON PLAINTIFF'S NEGLIGENT FAILURE TO WARN**

5                 **AND NEGLIGENT MISREPRESENTATION CLAIMS**

6       Plaintiff has lodged a variety of allegations against the Mylan Defendants, all of which

7   sound of inadequate warning claims.  SUMF ¶ 25.  As demonstrated above, Plaintiff's strict

8   liability marketing defect claim fails as a matter of law.  Similarly, Plaintiff's negligence-based

9   inadequate warning claims cannot survive summary judgment.

10           i.     Negligent Failure-to-Warn and Negligent Misrepresentation:

11               Information Provided to the FDA

12       Plaintiff's negligence and negligent misrepresentation claims are based, in part, on

13   allegations that the Mylan Defendants failed to provide information to the FDA.  SUMF ¶ 25.

14   [*See, e.g.* Comp. ¶¶ 17-18 (Negligence – "failed to exercise ordinary care in … reporting to the

15   FDA"; "failure to provide to the FDA information or data relevant to the safety of the Patch"),

16   *and* Comp. ¶¶ 21-22 (Negligent Misrepresentation – "the Defendants failed to communicate to

17   the FDA … that the use of this drug could cause serious injury and/or death"; "failed to

18   exercise reasonable care or competence in obtaining or communicating information regarding

19   the safety and efficacy of the Patch to the FDA ….").]  These "fraud-on-the-FDA" claims are

20   preempted by federal law.

21       In *Buckman*, the United States Supreme Court held:

22           [S]tate-law fraud-on-the-FDA claims conflict with, and are
        therefore impliedly preempted by, federal law.  The conflict

23           stems from the fact that the federal statutory scheme amply
        empowers the FDA to punish and deter fraud against the

24           Administration, and that this authority is used by the
        Administration to achieve a somewhat delicate balance of

25           statutory objectives.  The balance sought by the Administration
        can be skewed by allowing fraud-on-the-FDA claims under state

26           tort law.

27   *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 348 (2001) (footnote omitted).

28       Therefore, "state-law claims predicated on allegations that a manufacturer made

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE,
SUMMARY ADJUDICATION; MEMORANDUM OF POINTS AND AUTHORITIES

1   misrepresentations to the Food and Drug Administration ('FDA') are prohibited by federal

2   law." *Adams*, Case No. CV09-09550 R (SSx), 2010 U.S. Dist. LEXIS 33066 at *17 (citing

3   *Buckman*, 531 U.S. at 350, 353) (striking allegations under Fed. R. Civ. P. 12(f)).  Plaintiff's

4   negligence and negligent misrepresentation claims that are premised on inadequate or

5   misleading disclosures to the FDA fail as a matter of law.  Summary judgment is proper.

6                          ii.    Negligent Failure-to-Warn: Information Provided to the Decedent

7                                 or the Public

8            Plaintiff has also grounded her negligent failure-to-warn claims, in part, on allegations

9   that the Mylan Defendants provided insufficient or misleading information to Decedent and the

10   general public.  SUMF ¶ 26.  The Mylan Defendants respectfully request that the Court grant

11   summary judgment on these claims, as Mylan had no duty to warn Decedent or the public

12   under the learned intermediary doctrine, and Plaintiff's claims lack sufficient evidence of

13   breach and causation to create an issue of material fact.

14           In contrast with strict liability claims, product liability claims premised on a negligence

15   theory require an additional showing.  In such a negligence action, a plaintiff must show that

16   the defendant owed her a legal duty, breached that duty, that the breach was a proximate cause

17   of her injury, and that the defect in the product was due to the defendant's negligence.

18   *Gonzalez v. Autoliv ASP, Inc.*, 154 Cal. App. 4th 780, 793, 64 Cal. Rptr. 3d 908, 919 (Ct. App.

19   2007) (citing *Merrill*, 26 Cal. 4th at 477).  "Negligence law in a failure-to-warn case requires a

20   plaintiff to prove that a manufacturer or distributor did not warn of a particular risk for reasons

21   which fell below the acceptable standard of care, i.e., what a reasonably prudent manufacturer

22   would have known and warned about." *Anderson v. Owens-Corning Fiberglas Corp.*, 53 Cal.

23   3d 987, 1002, 281 Cal. Rptr. 528, 810 P.2d 549, 559 (1991).

24           California has adopted the learned intermediary doctrine.  *See Brown*, 44 Cal. 3d at

25   1062 n.9 ("a manufacturer fulfills its duty to warn if it provides adequate warning to the

26   physician.").  Therefore, the Mylan Defendants had no duty to warn Decedent or the "general

27   public" regarding any risks associated with the MFTS.  Because there was no duty to warn,

28   Plaintiff cannot recover under a negligent failure-to-warn theory, premised on inadequate

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE,
SUMMARY ADJUDICATION; MEMORANDUM OF POINTS AND AUTHORITIES

1   information provided to the Decedent or the public at large.  *See Adams*, Case No. CV09-09550

2   R (SSx), 2010 U.S. Dist. LEXIS 33066 at *18 ("Plaintiffs' Complaint contains allegations that

3   Defendants failed to warn plaintiffs, the public, and the FDA.  As these allegations are

4   unequivocally barred under California and federal law, leave to amend would be futile.  The

5   Court strikes these improper allegations [under FRCP 12(f)] without leave to amend.").

6          Furthermore, even if there was a duty to warn, Plaintiff's claims still fail.  Just as she

7   cannot establish inadequacy of warnings and causation under her marketing defect claims,

8   Plaintiff's negligent failure-to-warn claim must also be dismissed.  *Huntman*, Case No. 97-

9   2155-IEG (RBB), 1998 U.S. Dist. LEXIS 13431 (when "the leaned intermediary doctrine

10  applies and, in the absence of evidence that [the prescribing physician] relied on defendant's

11  misrepresentations, plaintiff's claims for failure to warn, fraud and breach of warranty must be

12  dismissed.") (dismissing failure to warn claims).  The Mylan Defendants warned of the precise

13  risk now complained of by Plaintiff.  SUMF ¶ 27.  Further, as there is no allegation that

14  Decedent read any warnings or labeling provided by Mylan, Plaintiff cannot establish causation

15  on her negligent failure-to-warn claim.

16                  iii.   Negligent Misrepresentation: Information Provided to the

17                         Decedent or the Public

18         Plaintiff seeks recovery based on allegedly negligent misrepresentation made by the

19  Mylan Defendants to Decedent and the public.  SUMF ¶ 29.  Because Plaintiff has not

20  presented any evidence to prove that the Mylan Defendants made any representations to

21  Decedent, or that Decedent relied on such (unidentified) representations, Mylan asserts that

22  summary judgment should be granted.

23         "Negligent misrepresentation is a separate and distinct tort, a species of the tort of

24  deceit."  *Bily v. Arthur Young & Co.*, 3 Cal. 4th 370, 407 (Cal. 1992).  The elements of a

25  negligent misrepresentation claim are (1) a misrepresentation of a past or existing material fact,

26  (2) without reasonable grounds for believing it to be true, (3) with intent to induce another's

27  reliance on the fact misrepresented, (4) ignorance of the truth and justifiable reliance thereon by

28  the party to whom the misrepresentation was directed, and (5) damages.  *Fox v. Pollack*, 181

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE,
SUMMARY ADJUDICATION; MEMORANDUM OF POINTS AND AUTHORITIES

1   Cal. App. 3d 954, 962, 226 Cal. Rptr. 532 (1986).  Moreover, "in order to state a valid fraud or

2   misrepresentation claim, plaintiffs must identify the alleged misrepresentations made to them

3   by each defendant with heightened specificity."  *Adams*, Case No. CV09-09550 R (SSx), 2010

4   U.S. Dist. LEXIS 33066 at *13.  *See also* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a

5   party must state with particularity the circumstances constituting fraud or mistake.").

6         Plaintiff has not come forward with *any* evidence to prove that the Mylan Defendants

7   had any contact or communications with Decedent, much less specific evidence to satisfy the

8   heightened pleading requirements of Rule 9(b).  To the contrary, the Mylan Defendants

9   adequately communicated the risks associated with the MFTS to Decedent's prescribing

10  physician.  SUMF ¶ 30.  Additionally, Plaintiff has not met her burden of demonstrating

11  reliance.  Of course, with no evidence of any representations made by the Mylan Defendants to

12  Decedent, it logically follows that Decedent could not have acted upon such non-existent

13  communications.  For these reasons, summary judgment is proper for Plaintiff's negligent

14  misrepresentation claim, to the extent it is based on representations to the Decedent or the

15  public at large.

16              iv.   Negligent Failure-to-Warn and Negligent Misrepresentation:

17                    Information Provided to the Prescribing Physician

18        Similarly, Plaintiff's negligent failure-to-warn and negligent misrepresentation claims,

19  based on inadequate or misleading information provided to Decedent's prescribing physician,

20  are barred.  Both claims require proof of reliance and causation, neither of which can be

21  established by Plaintiff.  *See Romito v. Red Plastic Co.*, Inc., 38 Cal. App. 4th 59, 69 (1995)

22  (plaintiff in product liability action must show duty, breach of duty, causation, and damages to

23  establish negligence); *Charnay v. Cobert*, 145 Cal. App. 4th 170, 51 Cal. Rptr. 3d 471, 482

24  (Cal. Ct. App. 2006) (requiring plaintiff to prove justifiable reliance to recover on a negligent

25  misrepresentation claim).

26        "There can be no proximate cause where, as in this case, the prescribing physician did

27  not read or rely upon the allegedly inadequate warnings promulgated by a defendant about a

28  product."  *Conte v. Wyeth, Inc.*, 168 Cal. App. 4th 89, 112 (Cal. App. 1st Dist. 2008) (granting

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE,
SUMMARY ADJUDICATION; MEMORANDUM OF POINTS AND AUTHORITIES

1    summary judgment on negligent misrepresentation claims).  Dr. Rubin, Decedent's prescribing

2    physician, testified under oath that he had neither read nor relied on any representations or

3    warnings provided by the Mylan Defendants.  SUMF ¶¶ 33-34.  Therefore, Plaintiff's negligent

4    failure-to-warn and negligent misrepresentation claims fall short on the elements of causation

5    and reliance.  Mylan submits that summary judgment is appropriate in such circumstances.

6    C.    **THE MYLAN DEFENDANTS ARE ENTITLED TO SUMMARY**

7          **JUDGMENT ON PLAINTIFF'S REMAINING NEGLIGENCE**

8          **CLAIMS**

9    Beyond her negligent failure-to-warn or inadequate warning claims, Plaintiff's

10   remaining negligence claims can be categorized as either (1) negligent design ("Failure to use

11   due care in designing … the Patch"; "Failure to use proper materials reasonably suited to the

12   manufacture of the Patch"; "Formulating and designing the product"), (2) negligent

13   manufacture ("Failure to use due care in … manufacturing the Patch"; "Making the product"),

14   or (3) negligent testing ("Failure to obtain easily accessible information or data"; "Not

15   performing sufficient testing of the Patch …"; "Failure to use due care to test and inspect the

16   Patch …").  Because no issue of material fact exists regarding these remaining negligence

17   claims, and the Mylan Defendants are entitled to judgment as a matter of law, summary

18   judgment should be granted.

19   Plaintiff's negligent design and negligent manufacturing claims fail for the same

20   reasons as her corresponding strict liability claims.  Regarding the design of the MFTS,

21   Plaintiff's purported expert, Bret Berner, argues that the Mylan Defendants are negligent

22   because the MFTS does not contain a rate control membrane to prevent excess fentanyl from

23   diffusing through highly permeable or compromised skin.  Berner Report 2.  However, Berner

24   has no evidence that Decedent had compromised skin, and he admits that she did not have

25   highly permeable skin.  SUMF ¶ 35.  Clearly, Plaintiff has not produced enough evidence to

26   create an issue of material fact as to breach and causation on her negligent design claim.

27   *Harrison*, Case No. 94-CV-0692-K (JAH), 1998 U.S. Dist. LEXIS 13430 at *9 ("In order to

28   demonstrate that defendants are liable in tort, under either a negligent or strict liability standard,

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE,
SUMMARY ADJUDICATION; MEMORANDUM OF POINTS AND AUTHORITIES

1  plaintiffs must show that the product caused [plaintiff's] personal injury.") (citation omitted).

2  Mylan requests that the Court grant summary judgment.

3      Similarly, Plaintiff's negligent manufacturing claims fall short on the elements of

4  breach and causation.

> 5   [B]oth [negligence and strict liability] theories of liability require
> 6   that the defendant's defective product was a legal cause of the
>     plaintiff's injury.   Regardless of which theory of liability is
>     asserted, "… where a plaintiff alleges a product is defective,
> 7   proof that the product has malfunctioned is essential to establish
>     liability for an injury *caused by the defect*."
> 8

9  *Jenkins v. T&N Plc*, 45 Cal. App. 4th 1224, 1231 (Cal. App. 2d Dist. 1996) (quoting *Khan v.*

10  *Shiley Inc.*, 217 Cal. App. 3d 848, 855, 266 Cal. Rptr. 106 (1990) (original italics)).  *Accord*

11  *Fender v. Medtronic, Inc.*, 887 F. Supp. 1326, 1333 (E.D. Cal. 1995) ("Under California law,

12  the requirements for stating a claim for strict liability for a manufacturing defect are the same

13  as for negligence ….").

14      Bret Berner's unsupported, hypothetical manufacturing defects are insufficient to create

15  an issue of material fact under either strict liability or negligence.  *See Sparks*, 32 Cal. App. 4th

16  at 476 ("In a personal injury action, causation must be proven within a reasonable medical

17  probability based on expert testimony; a mere possibility is insufficient.") (citation omitted).

18  As Plaintiff cannot satisfy her burden on causation and breach, the Mylan Defendants assert

19  that summary judgment should be granted in their favor.

20      Lastly, Plaintiff's negligent testing claims are not recognized by California law.  As this

21  Court stated:

> 22   When the warnings accompanying a prescription product
>      adequately inform the physician of dangers inherent in its use, the
> 23   manufacturer's alleged failure to test that product cannot, by
>      itself, either cause injury or be a source of liability of the
> 24   manufacturer.   Imposing liability for breach of a purported
>      'independent duty to conduct long-term testing' would be beyond
> 25   the pale of any known California tort doctrine, because, *inter
>      alia*, the causal link between Plaintiff's known harm, and the
> 26   unknown outcome of the hypothetical testing is entirely
>      speculative.
> 27

28  *Phillippi v. Stryker Corp.*, No. 2:08-CV-02445-JAM-KJN, 2010 U.S. Dist. LEXIS 66470 at *5-

1   6 (E.D. Cal. June 30, 2010) (citations omitted) (granting summary judgment on failure to warn

2   claims) (Mendez, J.).

3        The speculative nature of such negligent testing claims is readily apparently in this case.

4   Plaintiff's Complaint summarily declares that the Mylan Defendants were negligent for failing

5   to perform unspecified tests.  Comp. ¶ 18.  Plaintiff depends on her purported regulatory and

6   labeling expert, Linda Motyka, to support her negligent testing claims.  Motyka argues that the

7   Mylan Defendants should test and control for the presence of "polymorphs" during the MFTS

8   manufacturing process.    Motyka Dep. 217:10-15.    Motyka opines that an unidentified

9   polymorph might allow excess fentanyl to cross into a user's bloodstream.  *Id.*  Of course, there

10  is no evidence of such unidentified polymorphs in the MFTS allegedly worn by Decedent.

11  SUMF ¶ 39.  Nor is there any evidence that the extreme heating, cooling, and reheating process

12  necessary to create a polymorph actually occurs in the manufacture of the MFTS.    *Id.*

13  Moreover, even if Mylan's manufacturing process were to create a polymorph, there are no

14  peer-reviewed studies that suggest that the polymorph would have the effect of *increasing* the

15  rate of fentanyl delivery; in fact, such a polymorph may very well *decrease* the rate of fentanyl

16  delivery and thereby threaten efficacy. SUMF ¶ 40.

17       Further, Decedent was found dead on June 4, 2007.  SUMF ¶ 1.  Plaintiff's expert

18  Motyka concedes there was simply no literature regarding whether it was even possible to

19  create a fentanyl polymorph until the issuance of the "Mallinckrodt patent" in 2010.  SUMF

20  ¶ 39.  Given that there is no scientifically reliable evidence to support Plaintiff's theory that

21  polymorphs in the MFTS worn by Decedent caused her death and there was no literature

22  regarding such a theory prior to 2010, it is obvious that any argument that testing would have

23  prevented Decedent's death is pure speculation.  Thus, even if California law recognized such a

24  claim, Plaintiff has not put forth enough evidence to survive summary judgment on her

25  negligent testing claims.  *See Valentine*, 68 Cal. App. 4th at 1483-84 ("Under a negligence

26  standard, a reasonable manufacturer would not be charged with knowing more than what would

27  come to light from the prevailing scientific and medical knowledge.").

28

1

D.   THE MYLAN DEFENDANTS ARE ENTITLED TO SUMMARY

2

JUDGMENT ON PLAINTIFF'S BREACH OF WARRANTY CLAIMS

3   Plaintiff alleges that the Mylan Defendants "impliedly and expressly warranted to

4   Decedent that the O'Sullivan Patch … was fit for the purpose for which it was to be used and

5   was free from design and manufacturing defects," and the MFTS allegedly worn by Decedent

6   was "defectively manufactured and designed and imminently dangerous."   SUMF ¶ 41.

7   Nevertheless, Plaintiff cannot recover under her theory of breach of express or implied

8   warranty for two reasons:  (1) Such claims are invalid under controlling California Supreme

9   Court precedent; and (2) even if the claims were valid under California law, any express or

10   implied warranties made by the Mylan Defendants were provided to the prescribing physician,

11   not Decedent, such that there is no privity between the Mylan Defendants and Decedent.

12   First, the California Supreme Court held that state law does not recognize express or

13   implied warranty claims against prescription drug manufacturers:

14   An action for breach of express warranty requires that the seller
     of goods conform to his promises concerning them, and may also
15   require reliance on the promise by the plaintiff.  An implied
     warranty that goods are "fit for the ordinary purposes for which
16   such goods are used" arises from a contract of sale; such a
     warranty does not require an express promise by the seller.  [¶]
17   Plaintiff's breach of warranty claims are inconsistent with our
     determination on the issue of strict liability for design defects.
18   We have concluded above that a manufacturer of prescription
     drugs is not strictly liable for injuries caused by such a defect that
19   is neither known nor knowable at the time the drug is distributed.
     To hold nevertheless that the manufacturer's representation,
20   express or implied, that a drug may be prescribed for a particular
     condition amounts to a warranty that it is "fit" for and will
21   accomplish the purpose for which it is prescribed, and to allow an
     action for personal injury for the breach of such warranties,
22   would obviously be incompatible with our determination
     regarding the scope of a drug manufacturer's liability for product
23   defects.

24   *Brown*, 44 Cal. 3d at 1071-72 (citations omitted).  *Accord Hufft*, 4 Cal. App. 4th at 24 ("Under

25   *Brown*, breach of express or implied warranty claims, like design defect claims, may not be

26   maintained against a manufacturer of prescription drugs who has properly prepared the product

27   and marketed it with warnings of known or knowable dangers.") (citation omitted).  The Mylan

28   Defendants are not susceptible to breach of express or implied warranty claims for their

1    manufacture of the FDA-approved MFTS.

2          Next, even if California law recognized such claims, Plaintiff's breach of warranty

3    claims fail because Decedent did not rely on any warranties provided by the Mylan Defendants.

4    *See Williams v. Beechnut Nutrition Corp.*, 185 Cal. App. 3d 135, 142, 229 Cal. Rptr. 605

5    (1986) ("In order to plead a cause of action for breach of express warranty, one must allege the

6    exact terms of the warranty, plaintiff's reasonable reliance thereon, and a breach of that

7    warranty which proximately causes plaintiff injury.").   Instead, Decedent relied on her

8    prescribing physician to use his education, knowledge, and experience to make an informed

9    decision on her behalf.  "The Court agrees with defendant that the leaned intermediary doctrine

10   applies and, in the absence of evidence that [the prescribing physician] relied on defendant's

11   misrepresentations, plaintiff's claims for failure to warn, fraud and breach of warranty must be

12   dismissed."  *Huntman*, Case No. 97-2155-IEG (RBB), 1998 U.S. Dist. LEXIS 13431 at *19.

13   *See also Cox v. DePuy Motech, Inc.*, 95-CV-3848-L(JA), 2000 U.S. Dist. LEXIS 22849 at *24

14   (S.D. Cal. Mar. 29, 2000) (granting summary judgment on breach of warranty claim, because

15   there was no evidence that prescribing physician relied on any statements by defendant) (citing

16   *Toole v. Richardson-Merrell. Inc.*, 251 Cal. App. 2d 689, 706-08, 60 Cal. Rptr. 398 (1967)

17   (discussing individual reliance by doctor as element of breach of warranty claim)); *Chandler v.*

18   *Chiron Corp.*, No. C-96-1047 SI, 1997 U.S. Dist. LEXIS 11251 at *22 (N.D. Cal. July 28,

19   1997) (granting summary judgment for defendant medical manufacturer on breach of express

20   warranty claims due to lack of reliance); *Evraets*, 29 Cal. App. 4th at 788 ("There is no privity

21   between [plaintiff] and respondents.  [Plaintiff] did not rely on [defendants'] judgment that an

22   intraocular device was appropriate for him.  Rather, he relied upon his physician's skill or

23   judgment to select or furnish a suitable product.  Thus, [plaintiff] cannot sue the manufacturers,

24   suppliers or distributors of the lens on an implied warranty of fitness theory.").

25         The District Court for the Central District of California recently summarized:

26              Under controlling California law, privity between the patient and
                the manufacturer of medical device or pharmaceutical product is
27              a necessary component of breach of warranty claims.  *See Blanco*
                *v. Baxter Healthcare Corp.*, 158 Cal. App. 4th 1039, 1058-59, 70
28              Cal. Rptr. 3d 566 (2008).  In the context of prescription medical

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE,
SUMMARY ADJUDICATION; MEMORANDUM OF POINTS AND AUTHORITIES

devices and pharmaceuticals, the transaction is between the manufacturer and the physician, not the patient. *Id.*

*Adams*, No. CV09-09550 R (SSx), 2010 U.S. Dist. LEXIS 33066 at *11 (dismissing claims based on breach of express and implied warranty because "there was simply no relationship between the defendant [pharmaceutical] manufacturers and the plaintiffs").

As discussed in the context of Plaintiff's marketing defect, failure-to-warn, and negligent misrepresentation claims, there is no evidence that the Mylan Defendants made any representations or warranties to Decedent.  In addition, the sworn testimony of Decedent's prescribing physician makes clear that he did not read, let alone rely upon, any representations or warranties by the Mylan Defendants.  SUMF ¶ 43.  Therefore, the Mylan Defendants request entry of summary judgment on Plaintiff's breach of warranty claims.

5.    <u>CONCLUSION</u>

Based on the foregoing, Mylan requests this Court to grant it summary judgment on each and every claim brought by Plaintiff.  In the alternative, Mylan moves this Court to adjudicate the issues raised in this Motion.

Dated:  November 3, 2010                    PIETRAGALLO GORDON ALFANO
                                            BOSICK & RASPANTI, LLP


                                            By:<u>/s/ Clem C. Trischler</u>
                                               Clem C. Trischler,
                                               *Admitted Pro Hac Vice*
                                               Attorneys for Defendants
                                               Mylan Inc.; Mylan Pharmaceuticals
                                               Inc.; and Mylan Technologies Inc.

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE,
SUMMARY ADJUDICATION; MEMORANDUM OF POINTS AND AUTHORITIES